**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMY LEIGHTY, a minor,** | ) | |
| **who sues by and through her parents** | ) | |
| **and natural guardians,** | ) | |
| **MARSHA AND CHRIS LEIGHTY,** | ) | |
| **on their own behalf,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **2:05cv918** |
| | ) | |
| **LAUREL SCHOOL DISTRICT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Before the Court for disposition are PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT *(Document No. 11)*, with brief in support *(Document No. 13)*, and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *(Document No. 14)*, with brief in support *(Document No. 15)*. Upon consideration of the filings of the parties, the evidence of record and the relevant statutory and case law, Plaintiff's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

### Background

Plaintiffs Amy, Marsha and Chris Leighty [hereinafter "Plaintiffs" or "Leightys"] commenced this action against the Laurel School District [hereinafter "Defendant" or "District"] under the Individuals with Disabilities Education Act [hereinafter "IDEA"], 20 U.S.C. § 1400 *et seq.*, and the matter is before the Court pursuant to 20 U.S.C. § 1415(i)(2). Plaintiff Amy Leighty, a student being educated in the District, has specific learning disabilities in the areas of reading, writing, speech and language. Plaintiff's Concise Statement of Material Facts at ¶ 3.[1] In April, 1996, pursuant to an evaluation, it was determined that she was eligible for special

---

[1]Unless otherwise noted, these facts are not contested by the District. Response to Concise Statement of Fact and Additional Material Facts at ¶¶ 1-44.

education.  *Id.* at ¶ 4.  The parties agree that Amy is a "child with a disability" within the meaning of 20 U.S.C. § 1401(3).  *Id.* at ¶ 5.  She has been receiving special education services, including learning support and speech and language therapy, since entering first grade.  *Id.* at ¶ 6.

On October 6, 2000, a Comprehensive Evaluation Report [hereinafter "CER"] found Amy to have a Verbal IQ of 75, a Performance IQ of 94, and a Full Scale IQ of 83 on the Wechsler Intelligence Scale for Children, Third Edition [hereinafter "WISC-III"].  *Id.* at ¶ 7.  This evaluation included a scaled score of 76 on the Developmental Test of Visual-Motor Integration and standard scores of 65-68 in reading, 65-74 in math and 77 in writing on the Woodcock-Johnson Achievement Test.  *Id.* at ¶ 8.  The evaluation report recommended that Amy be provided with an increase in speech and language support, continued resource room instruction in reading, and continued assistance in regular education classes such as math, science and social studies.  *Id.* at ¶ 9.  A similar private evaluation found her to have a Verbal IQ of 79, a Performance IQ of 102, and a Full Scale IQ of 88.  *Id.* at ¶ 10.

As a child with a learning disability, Amy had an "individualized education program" [hereinafter "IEP"] within the meaning of 20 U.S.C. §§ 1412(a)(4), 1414(d).  An IEP written in January, 2002, governing her sixth-grade school year, included goals and objectives related to her auditory processing and phonological awareness.  *Id.* at ¶ 13.  She was to be provided with speech and language therapy, small group assistance in her regular education classes, the assistance of an aide, assistive technology, and continued learning support for reading, language arts, spelling and social studies.  *Id.*  A subsequent IEP was prepared for the 2002/2003 school year, which was the year that Amy spent in seventh grade.  *Id.* at ¶ 14.  This IEP included increased speech and language therapy, continued learning support for reading, English and geography, and a study hall.  *Id.*

During the fall of 2002, at the request of Amy's parents, Dr. Robin Barack, Ph.D., performed a psychological evaluation to determine the extent of Amy's progress through the educational system.  *Id.* at ¶ 15.  Dr. Barack's evaluation indicated that Amy had a Verbal IQ of 71, a Performance IQ of 90, and a Full Scale IQ of 78 on the WISC-III.  *Id.* at ¶ 16.  Having concluded that Amy was not making reasonable educational progress, Dr. Barack recommended that she be placed in the Kathern Dean Tillotson School [hereinafter "Tillotson"], which was

2

designed specifically to educate disabled children. *Id.* at ¶ 18.  Tillotson is an approved private school under 20 U.S.C. § 1412(a)(10)(B)(ii).

During the 2002/2003 school year, Amy received passing grades in all of her subjects. *Id.* at ¶ 19.  The District issued a new CER on May 1, 2003. *Id.* at ¶ 20.  This CER incorporated the private testing conducted at the request of Amy's parents and reported that Amy was receiving A's and B's in her regular education courses and B's and C's in her English and reading courses. *Id.*  The CER indicated that Amy had made educational progress, but her parents filed a dissenting opinion. *Id.* at ¶¶ 21-22.  On June 4, 2003, a revised IEP was created for Amy's eighth-grade school year. *Id.* at ¶ 23.  In July, 2003, at the request of Amy's parents, Dr. Barack performed an updated psychological evaluation to determine the educational progress that Amy was making. *Id.* at ¶ 24.  During this evaluation, Amy obtained slightly lower scores on the Woodcock-Johnson Achievement Test. *Id.* at ¶ 25.

Dr. Barack again opined that Amy had failed to make reasonable educational progress in the areas of reading, writing and math. *Id.* at ¶ 26.  She continued to recommend that Amy attend a private school for children with learning disabilities, such as Tillotson, so that she could receive an intensive program to improve her reading, writing and math skills. *Id.* at ¶ 27.  Dr. Barack relied on standardized test scores dating back to 2000 in order to formulate her opinion that Amy had not made reasonable educational progress during the 2002/2003 school year. *Id.* at ¶ 28. Results of Amy's Woodcock-Johnson III Tests of Achievement indicated that her scores went down to anywhere from two to seven points between November, 2002, and July, 2003. *Id.* at ¶ 29.  One test score stayed the same, while another went up by one point. *Id.*  Additional group achievement tests administered on March 31, 2003, found that Amy was functioning in the "non-mastery" level in the areas of reading, language, math, science and social studies. *Id.* at ¶ 31.

On July 24, 2003, Dr. Imad T. Jarjour, M.D., diagnosed Amy as having a moderate neurological impairment, thereby making her eligible for placement at Tillotson. *Id.* at ¶ 32. During the fall of 2003, a due process hearing was conducted pursuant to 20 U.S.C. § 1415(f). *Id.* at ¶ 33.  On December 30, 2003, Hearing Officer David Lee [hereinafter "Hearing Officer"] issued an opinion in which he ordered the District to conduct a comprehensive assistive technology evaluation and to incorporate the resulting recommendations into Amy's IEP. *Id.* at ¶

38.  He also ordered the District to provide Amy with a total of eight hours of compensatory education for assistive technology "consultation/follow-up" and transition services.  *Id.*  Since the Hearing Officer concluded that the District had provided Amy with a "free appropriate public education" [hereinafter "FAPE"] as defined by 20 U.S.C. § 1401(9), he concluded that she was not entitled to compensatory educational services for the 2002/2003 school year.  *Id.* at ¶ 39.  He also determined that Amy was not entitled to be placed at Tillotson, since it was not deemed to be the "least restrictive environment" within the meaning of 20 U.S.C. § 1412(a)(5).  *Id.*

Amy's parents filed exceptions challenging the Hearing Officer's conclusions that the District had provided Amy with a FAPE and that she was not entitled to be placed at Tillotson. *Id.* at ¶ 40.  On February 4, 2004, the Appeals Panel unanimously affirmed the Hearing Officer's decision.  *Id.* at ¶ 41.  The Appeals Panel relied on Amy's grades, curriculum-based assessments, speech and language evaluation skills, and standardized test scores in order to form its decision that Amy had been provided with a FAPE.  *Id.* at ¶ 42.  It was determined that, in order for Amy to retain her relative position with respect to the standardized test scores, she needed to make one-year gains in terms of academic achievement.  *Id.* at ¶ 44.

<u>Discussion</u>

The Leightys contend that the Appeals Panel's decision is contrary to the IDEA, that Amy is entitled to be placed at Tillotson, and that they are entitled to compensatory educational services for the violation of Amy's rights under the IDEA.  Complaint, pp. 8-9.  Both parties have filed motions for summary judgment, which are currently pending before the Court and, therefore, the subject of this opinion.  Jurisdiction in this Court is proper under 20 U.S.C. § 1415(i)(2)(A), which permits an IDEA action such as this to be "brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  Under § 1415(i)(2)(C), the Court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  The parties in the instant case agree that no additional evidence is needed to supplement the record.  Plaintiff's Motion for Summary Judgment at ¶ 4; Defendant's Motion for Summary Judgment at ¶ 5.  The Court has received the records of the administrative

proceedings and may, accordingly, proceed to make a determination pursuant to §
1415(i)(2)(C)(iii).

In *Board of Education v. Rowley*, 458 U.S. 176 (1982), commenting on the IDEA's
predecessor statute, the U.S. Supreme Court explained that "the provision that a reviewing court
base its decision on the 'preponderance of the evidence' is by no means an invitation to the
courts to substitute their own notions of sound educational policy for those of the school
authorities which they review." *Rowley*, 458 U.S. at 206.  The Court went on to say that the fact
that the statute requires the reviewing court to receive the records of the administrative
proceedings "carries with it the implied requirement that due weight shall be given to [those]
proceedings." *Id.*  The U.S. Court of Appeals for the Third Circuit recently noted that, "[w]hen
deciding an IDEA case, the District Court applies a modified version of *de novo* review and is
required to give due weight to the factual findings" made during the course of the administrative
proceedings. *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 389 (3d Cir. 2006).  In *Shore
Regional High School Board of Education v. P.S.*, 381 F.3d 194 (3d Cir. 2004), the Court of
Appeals stated as follows:

> The burden of proof that a District Court must apply when an IDEA decision by a
> state agency is challenged is unusual.  Although the District Court must make its
> own findings by a preponderance of the evidence, the District Court must also
> afford due weight to the [agency's] determination.  Under this standard, factual
> findings from the administrative proceedings are to be considered prima facie
> correct, and if a reviewing court fails to adhere to them, it is obliged to explain
> why.  In addition, if a state administrative agency has heard live testimony and has
> found the testimony of one witness to be more worthy of belief than the
> contradictory testimony of another witness, that determination is due special
> weight.  Specifically, this means that a District Court must accept the state
> agency's credibility determinations unless the non-testimonial, extrinsic evidence
> in the record would *justify* a contrary conclusion.  In this context, the word
> "justify" demands essentially the same standard of review given to a trial court's
> findings of fact by a federal appellate court.

*Shore Regional*, 381 F.3d at 199 (internal citations and quotation marks omitted; emphasis in
original).

At the outset, it must be noted that the Leightys incorrectly state the burden of proof
applicable in this proceeding.  They argue that they are entitled to summary judgment because

"the District has not proven" that it has provided Amy with an appropriately tailored special education program. Plaintiff's Brief in Support of Motion for Summary Judgment, p. 5. They also state, in unambiguous terms, that the District has the burden of proving, by a preponderance of the evidence, that Amy's IEP is reasonably calculated to provide meaningful educational benefit. *Id.*, p. 7. Apparently, the Leightys must have overlooked the U.S. Supreme Court's decision in *Schaffer v. Weast*, 126 S.Ct. 528 (2005). In *Schaffer*, the Court held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer*, 126 S.Ct. at 537. The Court came to this conclusion after noting that Congress was silent as to which party should bear the burden of proof in an IDEA case, noting that the typical default rule was to place the burden of proof on the party seeking relief in the relevant proceeding. *Id.* at 531. It is clear that, in this context, the term "burden of proof" was used to describe the "burden of persuasion" rather than the "burden of production." *Id.* at 533-534. Since the case came out of Maryland, which had no state law governing the burden of proof in IDEA proceedings, the Court did not decide whether a State may, if it so chooses, "override the default rule and put the burden always on the school district." *Id.* at 537.

Like Maryland, Pennsylvania has no law which expressly places the burden of proof on the District. *Greenwood v. Wissahickon School District*, 2006 U.S. Dist. LEXIS 4274, at 7-8, 2006 WL 279085, at 2 (E.D.Pa. 2006). Therefore, it is clear that the default rule is applicable, and that the Court has no occasion to consider the question left open by the Supreme Court in *Schaffer*. The Leightys likely think that the burden of proof is on the District because of the decision of the Court of Appeals in *Oberti v. Board of Education*, 995 F.2d 1204 (3d Cir. 1993). In *Oberti*, the Court of Appeals held that the burden of proof was on the school district throughout an IDEA case, rejecting the argument that the "due weight" mandate of *Rowley* necessitated the shifting of the burden to the party who was challenging the determination of the administrative agency in the District Court. *Oberti*, 995 F.2d at 1218-1220. In light of *Schaffer*, however, it is clear that *Oberti* is no longer the applicable law to the extent that it placed the burden of proof on the school district. To the extent that *Oberti* held that the burden of proof

remains on the same party throughout the case, however, *Oberti* remains the applicable law.[2]

In the instant case, the administrative determination was made before the Supreme Court's decision in *Schaffer*.  Consequently, the Hearing Officer and the Appeals Panel proceeded according to the mandate of *Oberti*.  With *Oberti* having been the applicable law at the time, this was entirely proper.  Nevertheless, the new rule applies to all cases pending when *Schaffer* was decided.  *Antoine M. v. The Chester Upland School District*, 420 F.Supp.2d 396, 401, n. 7 (E.D.Pa. 2006).  The burden of proof in this proceeding therefore is on the Leightys, since it should have been placed on them at the administrative level under the proper construction of the IDEA.  For this reason, the Court will proceed in accordance with the rule

---

[2]In *Oberti*, the school district argued that, in the District Court, the burden should have shifted to the party which was challenging the determination made by the administrative agency. *Oberti*, 995 F.2d at 1218.  The school district contended that such a shift in the burden was implicit in the *Rowley* rule, which requires the District Court to give "due weight" to the findings made at the administrative level.  *Id.*  The Court of Appeals rejected this argument, holding that "the due weight is owed to the administrative proceedings, not to the party who happened to prevail in those proceedings." *Id.* at 1219.  The Court of Appeals went on to hold that, with respect to the IDEA's "mainstreaming" requirement, the burden of proof was on the school district. *Id.* at 1219-1220.  *Schaffer* did not deal specifically with the IDEA's mainstreaming requirement, but rather with the more general question of which party bears the burden of proof when an IEP is challenged.  *Schaffer*, 126 S.Ct. at 531.  Nevertheless, the holding in *Schaffer* does not appear to be limited to any particular type of IDEA-related determination.  The Supreme Court based its decision on the silence of Congress with respect to the burden of proof, and the fact that the burden "typically" falls on the party seeking relief. *Id.*  Therefore, insofar as *Oberti* placed the burden of proof on the school district because of its "better access to the relevant information," it has been abrogated by *Schaffer*. *Oberti*, 995 F.2d at 1219; *Schaffer*, 126 S.Ct. at 536-537.  The Court of Appeals has recognized this fact itself. *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 391 (3d Cir. 2006).  Nevertheless, *Oberti* remains good law to the extent that it held that the burden of proof does not shift when the case comes before the District Court.  *Schaffer* addressed the burden of proof at the administrative level.  *Schaffer*, 126 S.Ct. at 537.  The logic of *Schaffer* and *Oberti* compels the conclusion that the burden of proof in the instant case is on the Leightys, since they are the party seeking relief.  It is also worthy of note that the District prevailed at the administrative level, and that the burden would not have shifted in this case even if the Court of Appeals, in *Oberti*, had accepted the school district's argument that the "due weight" mandate of *Rowley* placed the burden of proof on the party challenging the determination made at the administrative level.

announced in *Schaffer*, which places the burden of proof on the party seeking relief.[3]

The motion filed by the Leightys is somewhat vague with respect to the precise nature of the IDEA violation alleged. The Leightys contend that Amy has failed to make reasonable educational progress in the areas of reading and writing, that the District has failed to provide her with a FAPE since the 2002/2003 school year, and that her progress through the District's curriculum is not an accurate indicator of her level of educational achievement. Plaintiff's Motion for Summary Judgment at ¶ 6. It is not entirely clear whether their argument is based on the alleged inadequacy of the IEP itself, or whether their argument is based on the alleged failure of the District to properly implement a concededly valid IEP. The arguments advanced in their brief could be read to support either or both of these contentions. Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 5-9. Given this ambiguity, the Court will proceed to address both of these alternative arguments.

The Leightys argue that "the District did not monitor [Amy's] progress based upon her IEP or the development of concrete skills." Plaintiff's Brief in Support of Motion for Summary Judgment, p. 7. This argument appears to challenge the District's implementation of the IEP rather than the content of the IEP itself. Viewing the issue from this perspective, the Court is mindful of the following comments made by the U.S. Court of Appeals for the Fifth Circuit in *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000):

> [T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the

_____

[3]In *Greenwood v. Wissahickon School District*, 2006 U.S. Dist. LEXIS 4274, 2006 WL 279085 (E.D.Pa. 2006), the U.S. District Court for the Eastern District of Pennsylvania remanded the case to the administrative agency for further proceedings, since the earlier proceeding had occurred prior to the Supreme Court's decision in *Schaffer*. *Greenwood*, 2006 U.S. Dist. LEXIS 4274, at 11. In the instant case, there is no need for a remand. Initially, unlike the situation in *Greenwood*, neither party in this case seeks to introduce additional evidence. Secondly, the District prevailed at the administrative level despite the fact that the proceedings were conducted under the erroneous belief that the burden of proof was on the District. The result clearly would not have been different if the burden had been properly placed on the Leightys.

disabled child a meaningful educational benefit.

*Houston Independent School District*, 200 F.3d at 349.[4]  Under this standard, a school is only required to ensure that its students are receiving a meaningful educational benefit, and "[a] child need not improve in *every* area to obtain an educational benefit from his IEP."  *Clear Creek Independent School District v. J.K.*, 400 F.Supp.2d 991, 995 (S.D.Tex. 2005)(emphasis in original; internal quotation marks omitted).  The absence of a bright-line rule in this context is consistent with the deference owed to expert decisionmakers under *Rowley*.  Generally speaking, in order to defeat an IDEA-based claim alleging that it has failed to properly implement an IEP, a school district must demonstrate that: (1) the failure to implement was not a "complete" failure; (2) the variance from the special education and related services specified in the IEP did not deprive the student of a FAPE; and (3) the provision of special education and related services made meaningful[5] progress toward the achievement of the specific goals stated in the IEP.  *Ross v. The Framingham School Committee*, 44 F.Supp.2d 104, 119 (D.Mass. 1999).

In *Rowley*, the Supreme Court explained that Congress, by passing the Education for All Handicapped Children Act [hereinafter "EAHCA"], "sought primarily to make public education available to handicapped children."  *Rowley*, 458 U.S. at 192.  The EAHCA was a predecessor statute to the IDEA.  Prior to the statute's enactment, many disabled children were completely excluded from any form of public education, while others were "sitting idly in regular classrooms awaiting the time when they were old enough to drop out."  *Id.* at 191 (internal quotation marks omitted).  The action taken by Congress "did not impose upon the States any greater substantive standard than would be necessary to make [a disabled child's access to an education]

---

[4]The U.S. Court of Appeals for the Third Circuit recently followed the reasoning of *Houston Independent School District* in an unpublished opinion.  *Melissa S. v. School District of Pittsburgh*, 2006 U.S. App. LEXIS 14118, 5 (3d Cir. 2006).

[5]The word "meaningful" was not used by the U.S. District Court for the District of Massachusetts.  *Ross*, 44 F.Supp.2d at 119.  This Court has added the word "meaningful" in order to properly incorporate the standard established by two decisions of the U.S. Court of Appeals for the Third Circuit.  *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999); *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988).

9

meaningful." *Id.* at 192.  The intent of the statute "was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.*  "[T]he process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." *Id.*  "Whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." *Id.* at 197, n. 12.

In *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir. 1988), the U.S. Court of Appeals for the Third Circuit explained that the Education of the Handicapped Act [hereinafter "EHA"], another of the IDEA's predecessor statutes, was "intended to afford children with special needs an education that would confer meaningful benefit." *Polk*, 853 F.2d at 184.  The Court of Appeals rejected the notion that "the conferral of any benefit, no matter how small, could qualify as an 'appropriate education' under the EHA." *Id.*  The Court of Appeals elaborated on this standard further when it construed the IDEA in *Ridgewood Board of Education v. N.E.*, 172 F.3d 238 (3d Cir. 1999).  In *Ridgewood Board of Education*, the Court of Appeals explained that "the standard set forth in *Polk* requires significant learning and meaningful benefit[,]" and that the provision of merely more than a trivial educational benefit does not satisfy this standard. *Ridgewood Board of Education*, 172 F.3d at 247.  With that in mind, the Court now turns to the Leightys' argument that the District failed to properly implement Amy's IEP.

The thrust of the Leightys' argument is that the District monitored Amy's progress through the curriculum without placing a specific emphasis on the skill-related goals contained in her IEP.  Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 6-10.  The Hearing Officer determined that Amy had made progress in the skills areas identified in her IEP.  Ex. 7, p. 5.  The Appeals Panel's discussion indicates that it found likewise, given its determination that a September, 2003, assessment demonstrated that Amy had shown "mixed progress" in those areas.  Ex. 2, p. 9.  The evidence contained in the record supports this determination.  Toni Schooley, Amy's special education teacher, testified that Amy had made progress with respect to the goals outlined in her IEP.  Ex. 10, pp. 7-8, Tr. 235-238.  She made it clear that the specific goals enumerated in the IEP were incorporated within Amy's SRA reading program. *Id.*  In Ms.

10

Schooley's opinion, the progress made by Amy was meaningful.  *Id.*, p. 7, Tr. 235.  This opinion was based on very detailed information about the steps used in the SRA program.  *Id.*, pp. 4-5, Tr. 221-227.  According to Ms. Schooley, the first level of the program focused on prereading skills, with an emphasis on the sounds made by letters.  *Id.*, p. 4, Tr. 222.  The second level focused on "word attack" skills.  *Id.*  The third and final level focused on skill application.  *Id.*  Ms. Schooley testified that, when Amy began the program, she was given a reading test that involved the reading of a passage.  She made thirteen errors on the first part of the test and eleven errors on the second.  *Id.*, p. 5, Tr. 225.  When she took the same test at the conclusion of the program, she made only four errors.  *Id.*, p. 7, Tr. 234.  The first part of the test involved a timed reading, while the second part did not.  When Amy read the passage at the beginning of the program, it took her two minutes to finish it.  *Id.*, p. 7, Tr. 235.  When she read it at the conclusion of the program, it only took her one minute and forty seconds.  *Id.*  Considering the significant reductions in both the reading time and the error rate, Ms. Schooley testified that Amy had shown "a remarkable improvement."  *Id.*, p. 7, Tr. 234.

Amy's progress was also described by Kimberly McCabe, who worked as Amy's speech therapist.  Ms. McCabe explained how she had worked with Amy in order to address her auditory processing deficit.  Ex. 11, Tr. 131-137.  She also explained the periodic adjustments that had been made to Amy's IEP as she mastered certain skills along the way.  *Id.*, Tr. 132-136.  Ms. McCabe noted that Amy's mastery of several of the objectives in the IEP was the reason why certain adjustments had to be made.  *Id.*, Tr. 150.

The Court acknowledges the fact that this testimony was not uncontradicted.  Dr. Barack did not believe that Amy had made reasonable educational progress during the 2002/2003 school year.  Plaintiff's Concise Statement of Material Facts at ¶ 18.  Carol Utay, who was hired by the Leightys to provide Amy with private reading instruction, testified that Amy had not made reasonable educational progress.  *Id.* at ¶ 36; Ex. 8, p. 15, Tr. 528.  Amy's parents, who also testified at the hearing, clearly believe that her progress has been less than satisfactory.  Nevertheless, in *Shore Regional*, the Court of Appeals made it clear that "if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special

11

weight." *Shore Regional*, 381 F.3d at 199.  This Court must give the same amount of deference to the findings of the agency as a federal appellate court would normally give to the findings of fact made by a federal trial court.  *Id.*  Given this standard, it is clear that Amy's parents cannot meet their burden of showing, by a preponderance of the evidence, that the District has failed to comply with the essential components of Amy's IEP, either by failing to provide her with a FAPE or by deviating from the IEP in a material way.

The Leightys do not clearly specify how the District allegedly deviated from the IEP, arguing only that the District has focused more on Amy's progress through its curriculum than on the goals listed in her IEP.  Plaintiff's Brief in Support of Motion for Summary Judgment, p. 9.  Although the parties are free to introduce additional evidence under 20 U.S.C. § 1415(i)(2)(C)(ii), neither party in the instant case has opted to do so.  The Court is presented only with the administrative record.  On the basis of this record, the Leightys have failed to show that the District has *completely failed* to implement Amy's IEP, that any alleged variance from the special education services specified in the IEP has deprived her of a FAPE, or that the provision of special education services has failed to enable her to make meaningful progress toward achieving the goals listed in her IEP.  *Ross*, 44 F.Supp.2d at 119.  Accordingly, the Leightys' contention that the District has failed to implement Amy's IEP must fail.

As noted earlier, the arguments raised by the Leightys could also be construed as challenges to the adequacy of the IEP itself.  Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 5-10.  In *Rowley*, the Supreme Court explained the standard under which the validity of an IEP should be determined:

> Insofar as a State is required to provide a handicapped child with a "free appropriate public education," we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.  Such instruction must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.  In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Rowley*, 458 U.S. at 203-204.  The Supreme Court clearly opined that a central criterion for evaluating the validity of an IEP was whether it enabled the relevant disabled child to advance from one grade to the next.  That is precisely the criterion which the Leightys attempt to discount in the instant case.  Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 6-7.  The Court, of course, did not hold that every disabled child who was able to advance from grade to grade in a regular public school system was automatically receiving a FAPE.  *Rowley*, 458 U.S. at 203, n. 25.  Nevertheless, the importance of Amy's ability to advance from one grade to the next cannot be ignored for the purpose of this case.  The parties are in agreement that Amy received passing grades in all of her classes, and that she was able to advance from grade to grade.  Plaintiff's Concise Statement of Material Facts at ¶¶ 19-20; Response to Concise Statement of Fact and Additional Material Facts at ¶¶ 19-20.

The Leightys contend that Amy's grades, as well as her progress through the curriculum, are meaningless because of her poor reading and writing skills.  Plaintiff's Brief in Support of Motion for Summary Judgment, p. 7.  They argue that Amy's reading and writing abilities remain poor despite the fact that she has spent seven years in a special education program.  *Id.* As the District points out, however, the period of time preceding the 2002/2003 school year is not at issue in this case.  Defendant's Brief in Support of Motion for Summary Judgment, p. 8. On January 29, 2002, the parties in this case executed a settlement agreement which resolved proceedings initiated by the Leightys during the 2001/2002 school year.  *Id.*, n. 1.  Pursuant to that agreement, the District agreed to provide a fund in the amount of $27,000.00 for Amy's educational services.  Ex. 13, Settlement Agreement, at ¶ 1.  This fund was provided in lieu of compensatory education services, and the Leightys were given significant control over the allocation of the expenditures.  *Id.* at ¶¶ 1-8.  The Leightys agreed to accept, for the 2002/2003 school year, the IEP developed by the IEP team on January 7, 2002.  *Id.* at ¶ 9.[6]  Consequently, the Leightys' challenge to Amy's IEP must be directed against those versions which were developed subsequent to that date.

The arguments raised by the Leightys are results-oriented, and they do not rely on any

---

[6]It is for this reason that the Court views the Leightys' argument, at least in part, as a challenge to the implementation of the IEP rather than as a challenge to the IEP itself.

facial deficiencies in the IEP itself.  The Leightys contend that the IEP is not reasonably calculated to close (or narrow) the gap between Amy's level of achievement and her level of ability.  Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 9-12.  The IDEA, however, does not require the District to eliminate the very discrepancy that renders Amy disabled in the first place.  *Mather v. Hartford School District*, 928 F.Supp. 437, 446-447 (D.Vt. 1996).  It is, of course, true that "[t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  *Shore Regional*, 381 F.3d at 198.  Nonetheless, the Leightys' have failed to demonstrate that the IEP does not satisfy this standard.  A learning disability, by its very nature, renders it difficult for a child to learn on a level consistent with his or her intellectual potential.  Furthermore, Amy's verbal IQ scores were consistently lower than her IQ scores in other areas, thereby indicating that her potential with respect to other areas of learning may be greater than her reading and writing potential.[7]  Under these circumstances, the Court cannot conclude that Amy's IEP is not calculated to enable Amy to make meaningful educational progress in light of her potential.  The fact that she has been able to advance from one grade to the next, despite her severe learning disability, suggests that the IEP is not only calculated to allow her to make progress, but that it is achieving that objective as well.

The Leightys' argument is further undermined by the fact that the relief sought by them in this case is disfavored under the IDEA.  The IDEA, which was enacted pursuant to Congress' authority under the Spending Clause, makes a State eligible for financial assistance if it submits a plan providing assurances that it has in effect policies and procedures to ensure that it meets each of several conditions enumerated in the statute.  20 U.S.C. § 1412(a).  The first and fourth conditions require participating States to provide each disabled child with a FAPE and an IEP.  20 U.S.C. § 1412(a)(1), (4).  The fifth condition requires participating States to provide disabled children with an education in the least restrictive environment possible.  20 U.S.C. § 1412(a)(5).

---

[7]The Court does not suggest that Amy is incapable of mastering the relevant reading and writing skills.  Instead, the Court points this out in order to illustrate the progress that Amy has made in the other areas of her curriculum, and how her IEP has enabled her to overcome her reading deficiencies and to obtain good grades.

The statute unambiguously requires that disabled children, to the maximum extent possible, be educated in regular classrooms with their nondisabled peers. 20 U.S.C. § 1412(a)(5)(A). The removal of a disabled child from the regular educational environment should occur "only when the nature or severity of the disability of [that] child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

The statutory condition requiring participating States to educate disabled children in the least restrictive environment is often referred to as the IDEA's "mainstreaming" requirement. In order to give full effect to the intent of Congress, the Court must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Oberti*, 995 F.2d at 1215. The administrative record includes four versions of Amy's IEP. Ex. 13. Each version indicated that Amy was spending 21-60% of her time outside of the regular education classroom. *Id.* On January 7, 2002, it was noted that she was not being educated with her nondisabled peers when she was being taught in the areas of reading, language arts, spelling and social studies. *Id.* She was also outside of the regular classroom when her itinerant speech and language support services were provided. *Id.* A version of her IEP dated May 15, 2002, indicated that she was not being educated with nondisabled children in the areas of reading, geography and English. *Id.* At that time, Amy was also having a resource period in the learning support room. *Id.* These accommodations remained unchanged in an IEP dated March 6, 2003. *Id.* Finally, an IEP dated June 4, 2003, indicated that Amy was not participating in the general curriculum for reading, English and resource, and that she was also removed from the regular classroom to obtain speech and language services. *Id.* It is clear that the District has, in many instances, seen fit to remove Amy from the regular classroom and to provide her with the unique education that the IDEA requires. In other instances, the District has kept Amy in the regular classroom, thereby enabling her to interact with her nondisabled peers and to obtain whatever benefits may be associated with her inclusion.

In IDEA cases such as this, there is an obvious tension between the statute's requirement that every child be provided with a FAPE and its mandate that each disabled child's education be provided in the least restrictive environment. *Oberti*, 995 F.2d at 1214, n. 18. The Court of Appeals has admonished that the IDEA "requires that disabled students be educated in the least

restrictive *appropriate* educational environment." *Ridgewood Board of Education*, 172 F.3d at 249 (emphasis added). As the U.S. Supreme Court explained in *Florence County School District Four v. Carter*, 510 U.S. 7 (1993), the IDEA mandates that school districts either provide a disabled child with a FAPE in a public setting or place that child in an appropriate private school setting. *Florence County*, 510 U.S. at 15. In the instant case, the District has attempted to resolve the tension created by the IDEA's FAPE and mainstreaming requirements by providing individualized instruction where necessary and incorporation of the regular curriculum where possible. The arrangement provided for Amy is precisely what is required under the IDEA. Amy is not totally excluded from the regular curriculum, nor is she sitting idly in a regular classroom awaiting the time when she is old enough to drop out. *Rowley*, 458 U.S. at 191.

The propriety of the District's decision to include Amy within certain portions of the regular curriculum is further illustrated by the testimony of Heather Walzer, who teaches science to the District's seventh and eighth graders. Ex. 10, p. 29, Tr. 320. She explained how Amy wanted to be involved with the activities of her nondisabled peers, and how she worked hard to get her assignments done. *Id.*, Tr. 321-322. Ms. Walzer explained that some modifications were made in order to accommodate Amy's disabilities. For instance, Amy's vocabulary quizzes were broken into subsets, thereby enabling her to concentrate on the particular topics at hand. *Id.*, Tr. 323. Instead of taking a large quiz with fifteen word choices, Amy would get a quiz having three groups of five. *Id.* Amy's reading difficulties were accommodated with the use of chapter summaries. *Id.*, Tr. 324. Instead of having to read entire chapters, Amy would only have to read the summaries. *Id.* The chapters were made available to Amy in a CD format, but she did not need to utilize that option very often because she was able to understand the chapter summaries. *Id.*, Tr. 325.

Ms. Walzer testified that Amy was able to engage in meaningful learning with her nondisabled peers, and that she really enjoyed her lab periods. *Id.*, Tr. 325-326. She made it clear that, in order to make it through the class, Amy had to read. *Id.*, Tr. 329-330. According to Ms. Walzer, Amy's participation in the regular curriculum gave her the confidence to think independently and to support her opinions. *Id.*, Tr. 332-333. In some instances, Amy was able to accurately explain scientific concepts to her classmates while looking at pictures on a computer

16

screen.  *Id.*, Tr. 348.  Ms. Walzer opined that Amy was benefitting from the regular classroom environment, in which she was surrounded by peers who could "raise the bar" and give Amy an incentive to learn more.  *Id.*, Tr. 337.  While it is clear that Amy has not been able to learn at the same pace as the other students in her class, it is likewise clear that her educational experience has been meaningful and productive.[8]  That is all that the IDEA requires.  Given the mandate from Congress that the District provide Amy with a FAPE in the least restrictive environment, it is clear that the Leightys are not entitled to have Amy placed at Tillotson by and at the expense of the District.

The Leightys attempt to buttress their argument by asserting that the No Child Left Behind Act ("NCLBA"), 20 U.S.C. § 6301 *et seq.*, changed the way in which cases brought under the IDEA should be analyzed.  Complaint, p. 3, at ¶¶ 11-12; Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 14-16.  They contend that the FAPE determination under the IDEA now depends on how well a particular student performs on standardized tests administered by a participating State.  Apparently, their view is that even if Amy's progress through the District's curriculum would have been relevant for purposes of the IDEA before the enactment of the NCLBA, it is no longer relevant today.  The NCLBA was signed into law on January 8, 2002. *State of Connecticut v. Spellings*, 2006 U.S. Dist. LEXIS 69552, at 15, 2006 WL 2789871, at 5 (D.Conn. 2006).  According to the Leightys, the achievement standards referenced in the NCLBA are now incorporated within the IDEA.  Complaint, p. 3, at ¶¶ 11-12; Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 14-16.  Although the District specifically refutes the Leightys' argument that only standardized tests may be used to assess Amy's educational progress, the District does not address the NCLBA issue.  Defendant's Brief in Support of

---

[8]The Court decides only that the District has provided Amy with a meaningful educational experience, and that the requirements of the IDEA have been satisfied.  The question of whether she would be better off at Tillotson is not before the Court, and the Court in no way disparages the preference of the Leightys to have her educated at Tillotson.  The inquiry in the present case is not whether Amy would benefit more from an education elsewhere, but rather whether the District has provided her with a FAPE.  The Court expresses no opinion as to whether Amy would receive a better education in an approved private school.  The Leightys remain free to pursue, at their own expense, whatever educational alternatives and supplemental programs that they may deem appropriate.

Motion for Summary Judgment, p. 14.  Nevertheless, since the Leightys have raised the argument, the Court will proceed to address it.

At the outset, it is noteworthy that the IDEA was enacted pursuant to Congress' authority under the Spending Clause.  In *Arlington Central School District Board of Education v. Murphy*, 126 S.Ct. 2455 (2006), the U.S. Supreme Court stated as follows:

> Congress has broad power to set the terms on which it disburses federal money to the States, but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously[.] Legislation enacted pursuant to the spending power is much in the nature of a contract, and therefore, to be bound by federally imposed conditions, recipients of federal funds must accept them voluntarily and knowingly.  States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain.  Thus, in the present case, we must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds.

*Arlington Central*, 126 S.Ct. at 2459 (citations and internal quotation marks omitted). Accordingly, the Leightys can prevail on their argument only by showing that the NCLBA's standardized testing requirements are unambiguously incorporated within the IDEA's FAPE and IEP requirements.

In order to receive federal funds under the IDEA, a State must submit a plan which provides assurances that it has in effect policies and procedures to ensure that it meets each of several conditions.  The first, fourth and fifth conditions are the IDEA's FAPE, IEP and mainstreaming requirements.  20 U.S.C. § 1412(a)(1), (4), (5).  The sixteenth condition requires the inclusion of all children with disabilities in "all general State and districtwide assessment programs," including the assessments required under the NCLBA.  20 U.S.C. § 1412(a)(16).  The NCLBA directs State educational agencies wishing to receive NCLBA funds to submit a plan that is coordinated with other federal programs under Title 20, including that established by the IDEA.  20 U.S.C. § 6311(a)(1).  The NCLBA also permits State educational agencies to submit consolidated plans pursuant to 20 U.S.C. § 7842.

The statutory language regarding the coordination of state plans clearly does not constitute an unambiguous change in the conditions imposed on recipient States by the IDEA.

The NCLBA contains no specific language which purports to alter the IDEA's FAPE and IEP requirements. *Kirby v. Cabell County Board of Education*, 2006 U.S. Dist. LEXIS 67254, at 20, 2006 WL 2691435, at 6 (S.D.W.Va. 2006). Consequently, the language regarding coordination found in 20 U.S.C. § 6311(a)(1) does not alter the Court's analysis with respect to Amy's FAPE and IEP under the IDEA.

The sixteenth condition listed in the IDEA, which requires recipient State educational agencies to include disabled children in the assessment programs mandated by the NCLBA, likewise fails to effect an unambiguous change in the IDEA's FAPE and IEP requirements. Although the IDEA clearly conditions the States' receipt of IDEA funds on the inclusion of disabled children in the assessments mandated by the NCLBA, it does not require that FAPE determinations be based on the results of those assessments, nor does it require that the IEP's prepared for disabled children be designed specifically to enhance their scores on standardized tests. While it is clear that both the IDEA and the NCLBA require recipient States to include disabled children in the assessments, with the modifications necessitated by their disabilities, neither statute indicates that FAPE determinations under the IDEA are controlled by the performance of disabled children on assessments required under the NCLBA. 20 U.S.C. §§ 1412(a)(16), 6311(b). The sixteenth condition listed in the IDEA is consistent with the preference for mainstream education embodied within the fifth condition. 20 U.S.C. § 1412(a)(5), (16). Congress has made it clear that, to the extent possible, disabled children are to be educated and assessed in the same manner as their nondisabled peers. These unambiguous conditions bind recipients of federal funds available under the IDEA. The FAPE and IEP requirements are distinct conditions, and they are not dependent on those forbidding the exclusion of disabled children. The intent of Congress, in this respect, could not be more clear. Even if the statutes were deemed to be ambiguous, however, they would have to be read "from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Arlington Central*, 126 S.Ct. at 2459. Since no reasonable state official would clearly understand that, by accepting IDEA funds, a State is obligated to provide FAPE's and IEP's specifically designed to increase the scores of disabled children on standardized assessments mandated by the NCLBA, the

Leightys' argument must fail.

The NCLBA left unchanged the first and fourth conditions listed in the IDEA.  The assessments required under the NCLBA, however, can be considered as one factor in the broader inquiry as to whether a given disabled child's education is meaningful.  The Court does not mean to suggest that the results of standardized tests are irrelevant to the FAPE and IEP inquiries. "*Rowley* and *Polk* reject a bright-line rule on the amount of benefit required of an appropriate IEP in favor of an approach requiring a student-by-student analysis that carefully considers the student's individual abilities."  *Ridgewood Board of Education*, 172 F.3d at 248.  The governing law forbids both singular reliance upon, and the total exclusion of, any particular factor with respect to a disabled child's education.

In the instant case, the Leightys do not point to the results of any particular assessments required under the NCLBA.  For this reason, the Court cannot weigh such results, if any exist, as a factor in determining whether Amy has been provided with a FAPE and an appropriate IEP. Perhaps that is why the District has not specifically addressed the Leightys' NCLBA argument. In any event, it is clear that the Leightys' argument with respect to the NCLBA is unavailing.  To the extent that the Leightys argue that standardized tests other than those mandated by the NCLBA indicate that Amy has made no meaningful educational progress, the Court concludes that the available standardized testing results do not satisfy the Leightys' burden of proving, by a preponderance of the evidence, that Amy has not been provided with a FAPE.  In so concluding, the Court gives due weight to the administrative determination that Amy, in order to retain her relative position from one year to the next, needed to make a one-year gain in terms of achievement.  Ex. 2, p. 9.

## Conclusion

On the basis of the current record, the Court cannot conclude that the District has failed to provide Amy with a FAPE.  The Court does conclude that the District has not violated any of Amy's rights under the IDEA, that Amy is not entitled to placement at Tillotson at public expense, and that an award of compensatory educational services is not warranted.  The ideal of an education which maximizes the potential of a disabled child, however desirable it may be, is not mandated by law.  The District has complied with the mandates of the IDEA, and it cannot be

said that Amy's educational experience has been meaningless. "Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *A.B. v. Lawson*, 354 F.3d 315, 331 (4th Cir. 2004). The question of whether the District is providing Amy with the best education possible, or whether she would receive a better education at Tillotson, is a question that is beyond both the scope of this case and the expertise of the Court. Accordingly, the Court will deny the Leightys' Motion for Summary Judgment *(Document No. 11)* and grant the District's Motion for Summary Judgment *(Document No. 14)*. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMY LEIGHTY, a minor,** | ) |
| **who sues by and through her parents** | ) |
| **and natural guardians,** | ) |
| **MARSHA AND CHRIS LEIGHTY,** | ) |
| **on their own behalf,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| **v.** | )          **2:05cv918** |
| | ) |
| **LAUREL SCHOOL DISTRICT,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER OF COURT**

AND NOW, this 12th day of October, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Plaintiffs' Motion for Summary Judgment *(Document No. 11)* is **DENIED** and that Defendant's Motion for Summary Judgment *(Document No. 14)* is **GRANTED**.

The Clerk shall docket this case closed.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:     Lilian A. Akin, Esquire
        Email: laakin@bellatlantic.net
        Evalynn B. Welling
        Email: evalynnbwelling@earthlink.net

        Patricia R. Andrews, Esquire
        Email: tandrews@andrewsandprice.com